# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2008       Decided September 8, 2009

No. 08-5085

NATIONAL ASSOCIATION OF MANUFACTURERS,
APPELLANT

v.

JEFFREY ALLEN TAYLOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00208-CKK)

———

*Thomas W. Kirby* argued the cause for appellant. With him on the briefs were *Jan Witold Baran*, *Jan Amundson*, and *Quentin Riegel*.

*Brady C. Williamson* was on the brief for *amici curiae* Iowa Association of Business and Industry, et al. in support of appellant.

*Nicholas J. Bagley*, Attorney, U.S. Department of Justice, argued the cause for appellee Jeffrey A. Taylor. With him on the brief were *Gregory G. Katsas*, Acting Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, *Jonathan F. Cohn*, Deputy Assistant Attorney General, and *Michael S. Raab*,

Attorney.

*Thomas E. Caballero*, Assistant Senate Legal Counsel, Office of Senate Legal Counsel, argued the cause for appellees Nancy Erickson, et al. With him on the brief were *Morgan J. Frankel*, Senate Legal Counsel, *Patricia Mack Bryan*, Deputy Senate Legal Counsel, *Grant R. Vinik*, Assistant Senate Legal Counsel, *Irvin B. Nathan*, General Counsel, U.S. House of Representatives, *Kerry W. Kircher*, Deputy General Counsel, and *Christine M. Davenport* and *Richard A. Kaplan*, Assistant Counsel.

*Donald J. Simon*, *Fred Wertheimer*, and *J. Gerald Hebert* were on the brief for *amici curiae* Campaign Legal Center, et al. in support of appellees.

Before: GINSBURG, HENDERSON, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: More than fifty years ago, the Supreme Court held that the public disclosure of "who is being hired, who is putting up the money, and how much" they are spending to influence legislation is "a vital national interest." *United States v. Harriss*, 347 U.S. 612, 625-26 (1954). Today, we consider a constitutional challenge to Congress' latest effort to ensure greater transparency, the Honest Leadership and Open Government Act of 2007. Because nothing has transpired in the last half century to suggest that the national interest in public disclosure of lobbying information is any less vital than it was when the Supreme Court first considered the issue, we reject that challenge.

3

I

A

Congress first enacted comprehensive lobbying regulation in 1946 with passage of the Federal Regulation of Lobbying Act (FRLA), Pub. L. No. 79-601, tit. III, 60 Stat. 839 (1946). The Act required paid lobbyists, defined as persons whose services were engaged for the purpose of influencing legislation, to register with the Secretary of the Senate and the Clerk of the House of Representatives. *Id.* § 308(a), 60 Stat. at 841. Among other things, registered lobbyists were required to disclose, on a quarterly basis, the identity of each person who contributed $500 or more to fund their lobbying efforts. *Id.* § 305(a)(1), 60 Stat. at 840. The FRLA remained on the books as the primary font of federal lobbying regulation for fifty years.

In 1995, concerned that the FRLA had "failed to ensure the public disclosure of meaningful information about individuals who attempt to influence the conduct of officials of the Federal government," H.R. REP. NO. 104-339, pt. 1, at 5 (1995), the 104th Congress scrapped the Act and started from scratch. By unanimous vote of both Houses,[1] Congress passed the Lobbying Disclosure Act of 1995 (LDA), Pub. L. No. 104-65, 109 Stat. 691 (codified as amended at 2 U.S.C. §§ 1601 *et seq.*), which began with the following recitation of findings setting forth the need for a more aggressive approach to lobbying regulation:

> The Congress finds that --
>
> (1) responsible representative Government requires public awareness of the efforts of paid lobbyists to influence the public decisionmaking process in both

---

[1]*See* 141 CONG. REC. 20195, 34815-20 (1995).

the legislative and executive branches of the Federal Government;

(2) existing lobbying disclosure statutes have been ineffective because of unclear statutory language, weak administrative and enforcement provisions, and an absence of clear guidance as to who is required to register and what they are required to disclose; and

(3) the effective public disclosure of the identity and extent of the efforts of paid lobbyists to influence Federal officials in the conduct of Government actions will increase public confidence in the integrity of Government.

2 U.S.C. § 1601.

In concert with these findings, Congress enacted a new statutory scheme containing broader disclosure obligations, a more expansive definition of lobbying,[2] and a more robust enforcement scheme. The LDA requires lobbyists (or their employers) to register with the Secretary of the Senate and Clerk of the House within 45 days of making or being retained to

---

[2]The LDA defines a "lobbyist" as any individual who (with exceptions) is "employed or retained by a client" for services that include making "lobbying contact[s]." 2 U.S.C. § 1602(10). The Act defines a "lobbying contact" as (with exceptions) a communication to a covered legislative or executive branch official with regard to "the formulation, modification, or adoption" of (inter alia) federal legislation, regulations, or policies. *Id.* § 1602(8)(A). "Lobbying activities" is defined as "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others." *Id.* § 1602(7).

make lobbying contacts. 2 U.S.C. § 1603(a)(1), (2). Each registration must contain identifying information regarding the registrant (i.e., the lobbyist or employer of lobbyists) and each of its clients. *Id*. § 1603(b)(1), (2). It must also contain a statement of "the general issue areas in which the registrant expects to engage in lobbying activities on behalf of the client" and specific issues that have already been or are likely to be addressed in its lobbying activities. *Id.* § 1603(b)(5). Each registrant must then submit periodic reports updating those disclosures and stating the income received from its clients as well as the expenses the registrant incurred in connection with lobbying activities conducted on its own behalf. *Id.* § 1604(b).

Particularly relevant here, the LDA provides that, "[i]n the case of a coalition or association that employs or retains other persons to conduct lobbying activities, the client is the coalition or association and not its individual members." *Id.* § 1602(2). For the first time, however, Congress took steps to partially pierce the veil of coalitions and associations that lobby Congress on behalf of their members. LDA § 4 required registrants -- including coalitions and associations -- to disclose not only their clients, but also:

> (3) the name, address, and principal place of business of any organization, other than the client, that --
>
> > (A) contributes more than $10,000 toward the lobbying activities of the registrant in a semiannual period . . . ; and
> >
> > (B) in whole or in major part plans, supervises, or controls such lobbying activities.

LDA § 4(b)(3), 109 Stat. at 696 (codified at 2 U.S.C. § 1603(b)(3) (1995)). According to the House Judiciary

Committee Report that recommended passage of the LDA, this provision was "intended to preclude evasion of the disclosure requirements of the Act through the creation of ad hoc lobbying coalitions behind which real parties in interest can hide." H.R. REP. NO. 104-339, pt. 1, at 18.

In 2007, after twelve years of experience with the LDA, and spurred by a series of lobbying-related scandals, *see* H.R. REP. NO. 110-161, pt. 1, at 9 (2007), Congress again enacted lobbying reform. According to the House Judiciary Committee Report, Congress' purpose was to close "loopholes in current law." *Id.* This time, it did not repeal its earlier handiwork. Instead, Congress amended the LDA while keeping much of it intact, including its statement of legislative findings and most of its definitions. The result was the Honest Leadership and Open Government Act of 2007 (HLOGA), Pub. L. No. 110-81, 121 Stat. 735.

Section 207 of HLOGA is the provision at issue on this appeal. It amends LDA § 4(b)(3), 2 U.S.C. § 1603(b)(3), by altering both the monetary and level-of-participation thresholds necessary to trigger disclosure of organizations other than clients. The participation threshold is our focus here. Instead of only requiring the disclosure of an organization that "in whole or in major part" plans, supervises, or controls the lobbying activities of the registrant, HLOGA requires the disclosure of any organization that "actively participates" in the planning, supervision, or control of such lobbying activities.

Amended § 1603(b) now requires that each registration contain (and that each quarterly report update):

> (3) the name, address, and principal place of business of any organization, other than the client, that --

> (A) contributes more than $5,000 to the registrant or the client in the quarterly period to fund the lobbying activities of the registrant; and
>
> (B) *actively participates* in the planning, supervision, or control of such lobbying activities[.]

2 U.S.C. § 1603(b)(3) (emphasis added). HLOGA also increased the civil penalties for anyone who "knowingly" fails to make the disclosures required by this and other sections, and added criminal penalties for "knowingly and corruptly" failing to do so. *Id.* § 1606(a), (b); *see infra* Part III.C.1. There is, however, a safe harbor from the disclosures required by § 1603(b)(3) for certain organizations that are identified on the registrant's website. 2 U.S.C. § 1603(b); *see infra* Part III.C.2.[3]

B

The plaintiff in this case, the National Association of Manufacturers (NAM), is "the nation's largest industrial trade association, representing small and large manufacturers in every industrial sector and in all 50 states." Appellant's Br. ii. Although some of NAM's more than 11,000 corporate members

---

[3]In addition to the provisions described above, HLOGA amended the LDA in numerous respects that are not at issue on this appeal. For example, it added a prohibition against lobbyists making certain gifts to or providing travel for legislative branch officials, HLOGA § 206, 121 Stat. at 747; it changed the window for disclosing prior executive or congressional employment from two years to twenty, *id*. § 208, 121 Stat. at 748; and it directed the Comptroller General to audit compliance by lobbyists and registrants, *id*. § 213, 121 Stat. at 750. HLOGA also amended another provision of the U.S. Code to limit lobbying by former members of Congress and former congressional employees. *Id.* tit. I, 121 Stat. at 736-41.

choose to disclose their affiliation with the association, NAM's policy is to keep its membership list confidential. Amundson Decl. ¶¶ 6-8. NAM employs approximately 35 people who make lobbying contacts with the federal government, *id.* ¶ 9, and it therefore must make disclosures under the LDA, 2 U.S.C. § 1603(a)(2).

According to NAM, hundreds of its corporate members make contributions that exceed the monetary threshold of amended § 1603(b)(3)(A). Amundson Decl. ¶ 7. The plaintiff explains that member groups like NAM "did not have to concern themselves" with disclosures under the 1995 version of § 1603(b)(3) because, "[a]s long as several members were involved, no single member would meet the ['in whole or in major part' participation] threshold." Appellant's Br. 45. The amended version of § 1603(b)(3), however, requires disclosure of any member who "actively participates" in planning, supervision, or control of lobbying activities, and this will require disclosure of many NAM members.

On February 6, 2008, NAM filed suit in the United States District Court for the District of Columbia, challenging the constitutionality of § 207 of HLOGA. The suit contends that 2 U.S.C. § 1603(b)(3), as amended by HLOGA § 207, violates the First Amendment both facially and as applied to NAM and similar membership organizations. NAM maintains that the section will chill NAM members from participating in public policy initiatives for fear of the consequences of public disclosure. It further argues that the disclosure requirements of amended § 1603(b)(3) are impermissibly vague. In the district court, NAM sought declaratory relief and an injunction against enforcement of the section. By agreement of the parties, NAM's motion for a preliminary injunction was converted into a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and the court decided the merits of the case on

the basis of the parties' written submissions. *See Nat'l Ass'n of Mfrs. v. Taylor*, 549 F. Supp. 2d 33, 37 (D.D.C. 2008).

The district court concluded that amended § 1603(b)(3) does not violate the First Amendment because the section is narrowly tailored to serve compelling governmental interests, and it further found that the section was not unconstitutionally vague. Accordingly, it denied NAM's motion and dismissed the complaint. *Id.* at 68. NAM now appeals, and we review de novo the district court's ruling on the motion for judgment on the pleadings. *See Thompson v. District of Columbia*, 428 F.3d 283, 285 (D.C. Cir. 2005). We consider NAM's First Amendment challenge in Part II and its vagueness challenge in Part III.

II

Amended § 1603(b)(3) does not prohibit lobbyists from saying anything. It requires only disclosure. Nonetheless, NAM explains that "the disclosures mandated by [amended § 1603(b)(3)] will discourage and deter speech, petitioning, and expressive association." Appellant's Br. 26. We agree with NAM that these are substantial First Amendment interests and that requiring disclosure can burden them. As the Supreme Court has noted, "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (citing, inter alia, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)).

But we also note that the Court, recognizing the lesser burdens that disclosure generally imposes on First Amendment interests, has upheld numerous statutes requiring disclosures by those endeavoring to influence the political system. For example, in *United States v. Harriss*, which we discuss in detail

below, the Court upheld lobbying disclosure requirements of the FRLA on the ground that the statute served a "vital national interest" in a "manner restricted to its appropriate end." 347 U.S. at 626. In so doing, the Court emphasized that Congress had "not sought to prohibit [lobbying] pressures," but had "merely provided for a modicum of information." *Id.* at 625. Similarly, in *Buckley v. Valeo*, the Court rejected a First Amendment challenge to campaign finance disclosure requirements of the Federal Election Campaign Act (FECA), holding that a disclosure requirement was a "reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view." 424 U.S. at 82. And in *McConnell v. FEC*, the Court upheld the expanded campaign finance disclosure provisions of the Bipartisan Campaign Reform Act (BCRA), including a provision requiring the disclosure of persons who contribute to groups or individuals that spend money on electioneering communications. 540 U.S. 93, 195-99 (2003).[4] The courts of appeals have been similarly deferential to disclosure statutes.[5]

---

[4]*See also FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986) (invalidating limits on independent expenditures made by certain non-profit corporations, but noting that such corporations are still required to disclose the source of the contributions that pay for those expenditures); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) (noting that "[i]dentification of the source of [corporate political] advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected").

[5]*See, e.g.*, *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 778-93 (9th Cir. 2006) (upholding an Alaska campaign finance disclosure statute); *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 460 (11th Cir. 1996) (rejecting a facial challenge to a Florida law requiring lobbyists to disclose their expenditures and the

The question we face at the outset is the level of scrutiny we should apply to NAM's First Amendment challenge. The parties vigorously debate whether the Supreme Court applies "strict," or some lesser-but-still-heightened form of scrutiny to disclosure statutes. On the one hand, the government notes that in *Buckley*, the Court used the term "exacting" rather than "strict" to describe the scrutiny it applied to the disclosure requirements of FECA. 424 U.S. at 64-68. On the other hand, NAM notes that the Supreme Court has, on occasion, used the terms "exacting" and "strict" interchangeably to describe the same First Amendment test. *See Burson v. Freeman*, 504 U.S. 191, 198 (1992); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). We, too, have described *Buckley*'s test as "strict" scrutiny. *AFL-CIO v. FEC*, 333 F.3d 168, 176 (D.C. Cir. 2003).

In many respects, this debate over the appropriate adjective is beside the point. Whatever the test is *called*, the Court has clearly described what the test *is*. Just two Terms ago, in *Davis v. FEC*, the Court explained that "we have closely scrutinized disclosure requirements, including requirements governing independent expenditures made to further individuals' political speech." 128 S. Ct. 2759, 2775 (2008). "To survive this scrutiny, significant encroachments 'cannot be justified by a mere showing of some legitimate governmental interest.'" *Id.* (quoting *Buckley*, 424 U.S. at 64). "Instead," the Court said,

> there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed," and the

---

identities of clients who provide money for those expenditures); *Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509, 512-13 (8th Cir. 1985) (upholding a Minnesota statute requiring disclosure of lobbyists' employers).

governmental interest "must survive exacting scrutiny." That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.

*Id.* (quoting *Buckley*, 424 U.S. at 64). This test is consistent with the scrutiny the Court applied to disclosure requirements in *Buckley* and *McConnell*.[6]

More important, however, the debate over the appropriate test to apply is irrelevant because it makes no difference to our disposition. As we said in *Blount v. SEC*, "if [a statute] can withstand strict scrutiny there is no need to decide the issue" of which test to apply. 61 F.3d 938, 943 (D.C. Cir. 1995). To

---

[6]*See McConnell*, 540 U.S. at 231 (requiring that compelled disclosure bear a "sufficient relationship" to an "important governmental interest"); *Buckley*, 424 U.S. at 68 ("The disclosure requirements, as a general matter, directly serve substantial governmental interests. In determining whether these interests are sufficient to justify the requirements we must look to the extent of the burden that they place on individual rights."); *see also Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 202 (1999) ("In [*Buckley v. Valeo*], we stated that 'exacting scrutiny' is necessary when compelled disclosure of campaign-related payments is at issue[, but] we nevertheless upheld, as substantially related to important governmental interests, the . . . disclosure provisions of the Federal Election Campaign Act."); *AFL-CIO*, 333 F.3d at 176 ("When facing a constitutional challenge to a disclosure requirement, courts . . . balance the burdens imposed on individuals and associations against the significance of the government interest in disclosure and consider the degree to which the government has tailored the disclosure requirement to serve its interests."); *Block v. Meese*, 793 F.2d 1303, 1315 (D.C. Cir. 1986) (concluding that the Supreme Court "has consistently required the application of a balancing test" for the validity of compelled disclosure).

satisfy strict scrutiny, the government must establish three elements: (1) "the interests the government proffers in support" of the statute must be "properly characterized as 'compelling'"; (2) the statute must "effectively advance[] those interests"; and (3) the statute must be "narrowly tailored to advance the compelling interests asserted." *Id.* at 944. In the following subparts we employ this framework to scrutinize the disclosure mandate of amended § 1603(b)(3). We conclude, in agreement with the district court, that the statute satisfies the requirements of strict scrutiny.

## A

1. We begin our examination of the first element of strict scrutiny -- the requirement that the governmental interest supporting the statute be "compelling" -- by asking just what that interest is in this case.

NAM maintains that Congress' purpose in amending § 1603(b)(3) was to require greater disclosure by a very limited class of entities, not extending to associations like NAM itself. According to NAM, it is "crystal clear" that amended § 1603(b)(3) "was intended to force disclosure of participants in so-called 'stealth coalitions,'" Appellant's Br. 8-9, which NAM characterizes as "ad-hoc groups that lobby under names that do not reveal, and may obscure, their membership," *id*. at 2. "That," NAM insists, "was the only purpose stated for" the section. *Id.* At the same time, however, NAM contends that amended § 1603(b)(3) "does not, in fact, compel greater disclosures concerning stealth coalitions than were already required under the LDA. . . . Instead, its substantial new burdens fall heavily on long-established and well-known membership organizations like the NAM." *Id.* Because this contention -- that the purpose of amended § 1603(b)(3) was to require greater disclosure by "stealth coalitions" but that it does not do so -- is

central to all three elements of NAM's strict scrutiny argument, we have some unpacking to do.

The term "stealth coalition" does not appear anywhere in amended § 1603(b)(3) (or in the original LDA, for that matter). That fact alone casts doubt on just how clear it is that Congress amended § 1603(b)(3) solely to force disclosures by such groups. The only evidence NAM identifies to support that claim are floor statements by managers of the legislation and other members who explained that § 207 of HLOGA "closes a loophole that has allowed so-called 'stealth coalitions,' often with innocuous-sounding names, to operate without identifying the interests engaged in the lobbying activities." Appellant's Br. 9 (quoting 153 CONG. REC. S10709 (daily ed. Aug. 2, 2007) (statement of Sens. Feinstein, Lieberman, and Reid)).[7] At best, these statements identify *a* purpose of the section, not its only purpose.

More important, the Supreme Court has repeatedly emphasized that courts should "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (same). In particular, "[f]loor

---

[7]*See* 153 CONG. REC. S260 (daily ed. Jan. 9, 2007) (statement of Sen. Lieberman) (explaining that HLOGA would "remove the cloak obscuring so-called stealth lobbying campaigns which occur when a group of individuals, companies, unions, or associations ban[d] together to form a lobbying coalition. These coalitions frequently have innocent sounding names . . . .[,] [b]ut in fact, they lobby on a range of issues that could never be identified by the name of the coalition."); 153 CONG. REC. H5743 (daily ed. May 24, 2007) (statement of Rep. Doggett) (stating that a "stealth lobbyist" is a "lobbyist for an unpopular cause" that "instead of indicating who they actually represent, . . . claim they represent a 'coalition' . . . and avoid any indication of the true parties in interest").

statements" from members of Congress, even from a bill's sponsors, "cannot amend the clear and unambiguous language of a statute." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 456-57 (2002). Here, the statutory language is quite clear. In enacting the LDA, Congress found that "responsible representative Government requires public awareness of the efforts of paid lobbyists to influence the public decisionmaking process in both the legislative and executive branches of the Federal Government." 2 U.S.C. § 1601(1). "[P]ublic confidence in the integrity of Government" will be increased, Congress declared, by "effective public disclosure of the identity and extent of the efforts of paid lobbyists to influence Federal officials in the conduct of Government actions." *Id.* § 1601(3). In short, and not surprisingly, the purpose of the lobbying disclosure statute is to provide greater public information about who is lobbying Congress and what they are lobbying about.

Although Congress did not repeat these findings when it enacted HLOGA, it had no reason to do so. HLOGA merely amended sections of the LDA, leaving the congressional findings intact. Moreover, a comparison of the text of amended § 1603(b)(3) with that of its predecessor renders Congress' specific purpose in making that amendment clear: Congress wanted to ensure disclosure not only of any organization that "in whole or in major part" plans a registrant's lobbying activities, but of any organization that "actively participates" in planning such activities. To that extent, the legislative history confirms the statutory text: Congress' specific purpose in amending § 1603(b)(3) was to close a "loophole[] in current law by requiring more rigorous disclosure of lobbying-related activities." H.R. REP. NO. 110-161, pt. 1, at 9. But neither the new nor the old version of § 1603(b)(3) limited its reach to "stealth" organizations; to the contrary, each expressly required disclosure of "*any*" organization other than the registrant's client

that met the section's thresholds. 2 U.S.C. § 1603(b)(3) (emphasis added); *see id.* § 1603(b)(3) (1995).

Furthermore, even if we were to rely on the cited floor statements to identify amended § 1603(b)(3)'s purpose, it is not at all clear that the sobriquet "stealth coalition" fails to encompass an entity like NAM. As NAM points out, its membership list is confidential and it prefers not to reveal which members actively participate in its lobbying efforts, thus permitting it "to operate without identifying the interests engaged in [its] lobbying activities." 153 CONG. REC. S10709. Although NAM's name does indicate that it is an association of "manufacturers," that term covers a lot of ground. NAM is an association of more than 11,000 members, "representing small and large manufacturers in every industrial sector and in all 50 states." Appellant's Br. ii. Surely all of their interests are not the same, and considering the broad range of issues upon which NAM lobbies, the term "manufacturing" provides relatively little in the way of identification.

If anything, then, the legislative history that NAM cites "creates more confusion than clarity about the congressional intent," *Lamie v. U.S. Trustee*, 540 U.S. 526, 539-42 (2004), which further confirms the wisdom of relying on the legislative text to determine the purpose of amended § 1603(b)(3). *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991) (declaring that "[t]he best evidence of [congressional] purpose is the statutory text"). As that text makes clear, the purpose of the challenged provision is to require disclosure of the identity of "any organization" that meets the statutory thresholds, 2 U.S.C. § 1603(b)(3), in order to serve Congress' underlying goal of increasing "public awareness of the efforts of paid lobbyists to influence the public decisionmaking process," *id.* § 1601(1).

2. Having identified the governmental interest at issue, we next ask whether it is sufficient to justify compelled disclosure. In making such a determination, we do not write on a blank slate. Not long after Congress first waded into the lobbying reform arena with the FRLA, the Supreme Court examined the law's validity under the First Amendment. In *Harriss*, a decision that NAM does not currently seek to overturn, *see* Appellant's Br. 35, the Court upheld the Act. 347 U.S. at 625-26. The Court premised that result on the same informational interest upon which the defendants in this case rely:

> Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent.

> Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much. . . .

> Under these circumstances, we believe that Congress, at least within the bounds of the Act as we have construed it, is not constitutionally forbidden to

> require the disclosure of lobbying activities. To do so would be to deny Congress in large measure the power of self-protection.

*Id.* at 625 (footnote omitted). This goal of providing Congress with information with which to evaluate the pressures that lobbyists bring to bear upon it, the Court concluded, is "a vital national interest." *Id.* at 626.

NAM insists that *Harriss* did not characterize the FRLA's broad disclosure rationale as a "vital" interest, but rather only the more restricted ends that the Act effectuated after the Court first narrowed its reach in response to a vagueness challenge. But the Supreme Court's language on this score is quite clear: The Act was "designed to safeguard a vital national interest," the Court said, and the passage quoted above sets out just what that interest was. 347 U.S. at 626.

Two decades later, in *Buckley*, the Court held that information about efforts to influence the political system is not only important to government officials (or candidates for office), but is also important for the public at large. In reviewing a statute requiring disclosure of campaign contributions and expenditures, the Court declared "that there are governmental interests sufficiently important to outweigh the possibility of infringement" of First Amendment rights, "particularly when the 'free functioning of our national institutions' is involved." 424 U.S. at 66 (internal citation omitted). "The governmental interests sought to be vindicated by the disclosure" of such contributions and expenditures, the Court said, "are of this magnitude." *Id.* The *Buckley* Court described a category of such interests as follows:

> [D]isclosure provides the electorate with information as to where political campaign money comes from and

> how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible . . . [and] also alert[s] the voter to the interests to which a candidate is most likely to be responsive . . . .

*Id.* at 66-67 (internal quotation marks and footnote omitted).[8]

There is nothing to suggest that the public interest in this type of information is diminished once the candidate has attained office and is exposed to the pressures of lobbying. Indeed, just as disclosure serves the important "informational interest" of "help[ing] voters to define more of the candidates' constituencies," *id*. at 81, it likewise helps the public to understand the constituencies behind legislative or regulatory proposals. Transparency in government, no less than transparency in choosing our government, remains a vital national interest in a democracy.

The Supreme Court decided *Harriss* before it adopted the current language of levels of scrutiny. But we have no doubt that the "vital national interest" *Harriss* identified in 1954 is also, in contemporary constitutional parlance, a "compelling" one. How else could it be when the "full realization of the

---

[8]*See Buckley*, 424 U.S. at 68 n.82 (referring to the "important informational function" played by disclosure requirements); *id.* at 81 (describing a disclosure provision as serving an "informational interest" that "increases the fund of information concerning those who support the candidates"); *see also McConnell*, 540 U.S. at 196 (stating that "providing the electorate with information" was one of "the important state interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements" and that supported the expanded disclosure requirements of BCRA).

American ideal of government by elected representatives depends" upon it? *Harriss*, 347 U.S. at 625. This conclusion is confirmed by the *Buckley* Court's determination that the "governmental interests sought to be vindicated" by disclosure requirements are of a magnitude sufficient "to outweigh the possibility of infringement" of First Amendment rights because "the 'free functioning of our national institutions' is involved." *Buckley*, 424 U.S. at 66 (internal citation omitted). Accordingly, whatever we call the test we apply, it is plain that the government has a compelling interest in providing the public and its elected representatives with information regarding "who is being hired, who is putting up the money, and how much" they are spending to influence public officials. *Harriss*, 347 U.S. at 625.

3. NAM maintains that the congressional findings set forth in the LDA are insufficient to support this informational interest and thus to satisfy strict scrutiny. Rather, there must be "studies, statistics, or empirical evidence explaining why established organizations like the NAM should be required to file disclosure statements." Appellant's Reply Br. 13. We disagree.

It is true that in *Turner Broadcasting System, Inc. v. FCC*, the Court said that "in the realm of First Amendment questions[,] . . . Congress must base its conclusions upon substantial evidence." 520 U.S. 180, 196 (1997). Even in *Turner Broadcasting*, however, the Court cautioned that "substantiality is to be measured" by a "deferential" standard, and that "deference must be accorded to [congressional] findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments." *Id.* at 195-96. Moreover, as the Court subsequently explained in approving a state's political contribution limits, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of

legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). The informational interest that Congress and the public have in knowing who is lobbying is hardly novel, *see Harriss*, 347 U.S. at 625-26, and given the Court's decisions in *Harriss* and *Buckley*, it cannot be termed implausible. And although limited, the legislative record here is no less substantial than the record the Court regarded as sufficient in *Nixon*, which consisted principally of newspaper accounts and the affidavit of a Missouri state senator. *See* 528 U.S. at 391-94.[9]

Furthermore, while "[i]t is true that in some First Amendment cases the Supreme Court has demanded an evidentiary showing in support of a state's law," *Nat'l Cable &*

---

[9]*Compare, e.g.,* 153 CONG. REC. S10709 (statement of HLOGA Senate managers that § 207 is needed to "close a loophole" allowing coalitions "to operate without identifying the interests engaged in the lobbying activities"); Alison Mitchell, *Loophole Lets Lobbyists Hide Clients' Identity*, N.Y. TIMES, July 5, 2002, at A1. Testimony in the hearings that preceded the LDA also supports the importance of the disclosures that these statutes compel. *See, e.g.*, *The Lobbying Disclosure Act of 1992: Hearing on S. 2279 Before the Subcomm. on Oversight of Gov't Mgmt. of the S. Comm. on Governmental Affairs*, 102d Cong. 83 (1992) (statement of Thomas Susman, Chair, American Bar Association Section of Administrative Law and Regulatory Practice) ("Corporations or other organizations occasionally hide their identities behind a coalition established or available for the purpose of preventing the public from learning of their efforts to influence congressional action. This plainly circumvents the [FRLA's] public disclosure goals."); *id.* at 34 (statement of Ann McBride, Senior Vice President, Common Cause) ("Very often those coalition groups operate under very lovely-sounding names, without the public or sometimes even the Congress having a clear understanding of the groups that are backing them.").

*Telecomms. Ass'n v. FCC*, 555 F.3d 996, 1000 (D.C. Cir. 2009) (citing *Turner Broadcasting*, 520 U.S. at 195), "[i]t is also true that in other First Amendment cases the Supreme Court has found 'various unprovable assumptions' sufficient to support the constitutionality of state and federal laws," *id.* (quoting *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61 (1973)).[10] At bottom, this is not a case like *Turner Broadcasting*, where Congress' justification for a statute rested on "economic" analysis that was susceptible to empirical evidence. 520 U.S. at 199. What we have instead is simply a claim that good government requires greater transparency. That is a value judgment based on the common sense of the people's representatives, and repeatedly endorsed by the Supreme Court as sufficient to justify disclosure statutes. *See Harriss*, 347 U.S. at 625-26; *Buckley*, 424 U.S. at 66-67; *McConnell*, 540 U.S. at 196. "The fact that a congressional directive reflects unprovable assumptions about what is good for the people . . . is not a sufficient reason to find that statute unconstitutional." *Paris Adult Theatre*, 413 U.S. at 62. It certainly was not a sufficient reason in *Harriss*, in which the Court made no inquiry into whether the legislative record supported the determination that disclosure of who was endeavoring to influence Congress was "a vital national interest." 347 U.S. at 626.

---

[10]*See Paris Adult Theatre*, 413 U.S. at 61-62 ("On the basis of these [unprovable] assumptions, both Congress and state legislatures have, for example, drastically restricted associational rights by adopting antitrust laws, and have strictly regulated public expression by issuers of and dealers in securities[,] . . . commanding what they must and must not publish and announce."); *Blount*, 61 F.3d at 944-45 & n.3 (rejecting the contention that the First Amendment requires the government "to support its findings with record evidence" where the governmental interest is "self-evident[]").

4. In sum, we conclude that Congress' interest in increasing "public awareness of the efforts of paid lobbyists to influence the public decisionmaking process," 2 U.S.C. § 1601(1), is sufficiently compelling to withstand strict scrutiny.[11]

B

We next consider whether amended § 1603(b)(3) "effectively advances" the interest the government proffers in support of it. *Blount*, 61 F.3d at 944. On its face, it certainly appears to. By requiring registrants to disclose the "name, address, and principal place of business" of any organization that contributes the monetary threshold and actively participates in the planning, supervision, or control of the registrant's lobbying activities, the section provides the very information -- "who is being hired, who is putting up the money, and how much" -- that *Harriss* found to be "a vital national interest." 347 U.S. at 625-26. As *Buckley* held with respect to the disclosure of independent expenditures supporting political candidates, amended § 1603(b)(3) serves the "informational interest" of "increas[ing] the fund of information concerning those who support" legislation. 424 U.S. at 81. And like the FECA provision upheld in *Buckley*, the amended section "goes beyond the general disclosure requirements" of the LDA "to shed the light of publicity" on lobbying activities that "would not otherwise be reported" because they do not come under the pre-

---

[11]The defendants argue that, in addition to the informational interest served by the disclosure requirements of § 1603(b)(3), those requirements also serve a compelling interest in "deter[ring] actual corruption and avoid[ing] the appearance of corruption." U.S. Attorney's Br. 27 (quoting *Buckley*, 424 U.S. at 67); *see* Legislative Defendants' Br. 28. Because we find the informational interest sufficient to survive strict scrutiny, we have no need to assess the sufficiency of the anti-corruption interest.

amendment thresholds. *Id.*; *see also id.* at 76 (noting that the FECA provision was "responsive to the legitimate fear that efforts would be made, as they had been in the past, to avoid the disclosure requirements by routing financial support of candidates through avenues not explicitly covered by the general provisions of the Act" (footnote omitted)).

NAM contends that amended § 1603(b)(3) "[d]oes not serve its intended purpose of forcing so-called 'stealth coalitions' to disclose the interests they represent." Appellant's Br. 1. "The simple fact," NAM insists, "is that [amended § 1603(b)(3)] compels no greater disclosure with respect to active participation or stealth coalitions than was already required by the LDA." Appellant's Br. 36.

Even if the section does compel no greater disclosure of stealth coalitions, this argument is only a straw man. As we discussed in Part II.A, Congress' interest is not limited to disclosure by such coalitions, but extends to disclosure by all associations, including associations like NAM. And the amended section plainly does advance the interest of greater disclosure by such associations -- else NAM would not be complaining and would have no standing to do so. Indeed, NAM concedes that under amended § 1603(b)(3), "groups like the NAM *will* provide some more disclosure concerning their own confidential associational activities." Appellant's Br. 18-19 (emphasis added). As NAM explains, this is because the original section did not require it to disclose the identities of corporate sponsors of its lobbying activities unless they planned, supervised, or controlled those activities "in whole or in major part." And "[a]s long as several members were involved" -- even substantially -- "no single member would meet the threshold." *Id.* at 45. By substituting the "actively participates" language, HLOGA § 207 closed the loophole that had

previously allowed multi-member associations, including NAM, to avoid disclosing contributing members altogether.

Hence, whether amended § 1603(b)(3) also elicits more information from some undefined set of "stealth coalitions" is beside the point, because it elicits more from those its text covers and thereby increases public awareness of the identities of those who lobby the federal government. Even if the section did not elicit more information from "stealth coalitions" as well, it would at worst be somewhat underinclusive. And "with regard to First Amendment *under*inclusiveness analysis, neither a perfect nor even the best available fit between means and ends is required." *Blount*, 61 F.3d at 946. "Because the primary purpose of underinclusiveness analysis is simply to ensure that the proffered state interest actually underlies the law, a rule is struck for *under*inclusiveness only if it cannot fairly be said to advance any genuinely substantial governmental interest, because it provides only ineffective or remote support for the asserted goals, or limited incremental support." *Id.* (internal citations and quotation marks omitted). Here, the proffered state interest extends to increased disclosure by all associations lobbying on behalf of unnamed parties. Given the injury that gives NAM standing to pursue this lawsuit, there is no doubt that amended § 1603(b)(3) effectively advances that interest.

Nor does NAM's argument that the section will not compel greater information from so-called stealth coalitions persuade us. NAM's argument is as follows:

> Like prior law, [amended § 1603(b)(3)] requires disclosures only from entities that actually hire lobbyists. Thus, stealth coalitions can avoid any reporting by the simple and common expedient of relying on the lobbyists of one or two members to make actual lobbying contacts. As under prior law,

> those members must file reports, but they will not disclose anything more than prior law already required.

Appellant's Br. 18. We need not decide whether this hypothetical in fact envisions a way for coalition members to avoid disclosure. Notwithstanding NAM's contention that "this approach is feasible [and] common," Appellant's Reply Br. 21, it offers no evidence that either is true. As NAM acknowledges, the individual organizations that actually finance and carry out the lobbying through their own employees will be subject to disclosure. Appellant's Br. 36. And it is not obvious that a coalition member would agree to serve as the sole public face of a controversial lobbying campaign just to hide the participation of fellow members. But even if some would, we see no reason why Congress cannot enact a scheme that plausibly yields a significant portion of the information it seeks, with the option of returning to the drawing board once again if creative and determined lobbyists succeed in finding and exploiting another loophole. *Cf. FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 209 (1982) ("[C]areful legislative adjustment . . . in a 'cautious advance, step by step,' . . . warrants considerable deference." (internal citation omitted)); *McConnell*, 540 U.S. at 158 ("[W]e respect Congress' decision to proceed in incremental steps in the area of campaign finance regulation.").

In a way, this hypothetical is itself yet another a straw man. As amici curiae Campaign Legal Center et al. rightly point out, "[i]f organizations do not establish a lobbying coalition and instead lobby individually, there *is* no lobbying coalition for the purposes of the LDA." Amicus Curiae Br. 14-15. And the statute "is not unconstitutionally underinclusive because it does

not require lobbying disclosure from a coalition that does not engage in lobbying." *Id.* at 15.[12]

In short, NAM perceives amended § 1603(b)(3) as less effective than it could be (although too effective with respect to NAM itself). But as we have said, "neither a perfect nor even the best available fit between means and ends is required" to satisfy this prong of the strict scrutiny test. *Blount*, 61 F.3d at 946. It is sufficient that amended § 1603(b)(3) effectively advances the LDA's general purpose of increasing "public awareness of the efforts of paid lobbyists to influence the public decisionmaking process," as well as the amended section's specific purpose of requiring disclosure of organizations that "actively participate[] in the planning, supervision, or control" of a registrant's lobbying activities.

---

[12]NAM charges that amended § 1603(b)(3) is fatally underinclusive in two further respects: it does not require an association to link its list of active participants to the issues on which the association has lobbied, which are listed separately, *see* Appellant's Reply Br. 18; and it does not require the disclosure of individuals (as opposed to organizations) who otherwise meet the section's thresholds, *see id.* at 19-20. But "a regulation is not fatally underinclusive simply because an alternative regulation, which would restrict [in this case, which would mandate disclosure of] *more* speech or the speech of *more* people, could be more effective." *Blount*, 61 F.3d at 946. "The First Amendment does not require the government to curtail [or to mandate disclosure of] as much speech as may conceivably serve its goals." *Id.* Moreover, as to NAM's second point -- and without minimizing in any way the burden that disclosure imposes on organizations -- Congress could reasonably conclude that disclosure requirements are even more burdensome on individuals and hence should not be as expansive. *See NAACP*, 357 U.S. at 462-63; *see also McIntyre*, 514 U.S. at 353-55.

## C

Finally, we consider whether amended § 1603(b)(3) is narrowly tailored. Under the strict scrutiny test, "narrowly tailored" means that "less restrictive alternatives" to the statute would not "accomplish the government's goals equally or almost equally effectively." *Blount*, 61 F.3d at 944.

NAM argues that § 207 is "radically untailored" because it "needlessly burden[s] long-standing groups when its target is the short-term secrecy of ad-hoc coalitions." Appellant's Br. 4. "This raises an obvious question," NAM says: "Why burden groups that have been registered as lobbyists for years in an effort to force disclosures from short term, ad-hoc entities?" *Id.* at 39. In NAM's view, there is a "less restrictive" alternative that would take care of the problem of short-term stealth coalitions: Congress could simply make the "statute applicable only to groups that have not been registered as lobbyists in the last two or three years." *Id.* at 39.

In this argument, we meet a sibling of the same straw man we met before. As our prior discussion makes clear, amended § 1603(b)(3)'s target is not the secrecy of "stealth coalitions" -- short-term or otherwise -- but rather that of any registrant with members that contribute the threshold amount and actively participate in the planning, supervision, or control of the registrant's lobbying activities. The section "burden[s] groups that have been registered as lobbyists for years" because its object *is* "to force disclosures" by such groups. Hence, even if an alternative aimed only at recently registered groups would be "less restrictive," it would not "accomplish the government's goals equally or almost equally effectively." *Blount*, 61 F.3d at 944.

But such an alternative would not in fact be "less restrictive" in the First Amendment sense merely because it affects fewer entities. Instead, it would introduce the problem of selectivity, burdening new voices more heavily than established ones. Arguably, such an "improvement" would be unlawfully discriminatory. *Cf. Davis*, 128 S. Ct. at 2774 ("[T]he unprecedented step of imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment."); *Anderson v. Celebrezze*, 460 U.S. 780, 793-94 (1983) ("A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment."). At the very least, Congress was not required to go down that path.

By choosing a regime based upon disclosure, Congress already opted for a regime considerably less restrictive than one based upon the direct regulation of lobbying. In *Buckley*, the Court said that "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evil[]" of ignorance regarding the source and expenditure of campaign funds. 424 U.S. at 68. Indeed, *Buckley* described a disclosure regime as a "reasonable and minimally restrictive method of *furthering* First Amendment values." *Id.* at 81 (emphasis added). We have no doubt, then, that amended § 1603(b)(3) readily passes the "narrow tailoring" element of the strict scrutiny test.

D

For the reasons discussed above, we conclude that amended § 1603(b)(3) meets the demands of strict scrutiny. A fortiori, the section also satisfies the test the Court specifically applied to disclosure requirements in *Davis*, *McConnell*, and *Buckley*,

whatever it is called. As we have noted, to survive scrutiny under that test,

> there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed," and . . . the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.

*Davis*, 128 S. Ct. at 2775 (quoting *Buckley*, 424 U.S. at 64); *see supra* note 6.

As discussed in Parts II.B and C, there is more than a "substantial" relation between the governmental interest in greater transparency and the information that amended § 1603(b)(3) requires to be disclosed; in fact, the section's disclosure requirements are narrowly tailored and effectively advance that interest. Moreover, as discussed in Part II.A, the governmental interest in providing information about "who is being hired, who is putting up the money, and how much" they are spending to influence federal decisionmakers, *Harriss*, 347 U.S. at 625, is not just "some legitimate governmental interest," *Davis*, 128 S. Ct. at 2775 (quoting *Buckley*, 424 U.S. at 64). It is a "vital national interest." *Harriss*, 347 U.S. at 626.

We do not minimize the significance of NAM's concern that some of its members may be deterred from active participation in its lobbying activities by fear of the collateral consequences of public disclosure of their roles, an issue we address in detail in the next subpart. But it is clear that "the strength of the governmental interest" in providing greater information about lobbying "reflect[s] the seriousness of the actual burden" that disclosure puts "on First Amendment rights." *Davis*, 128 S. Ct. at 2775. This conclusion is confirmed

by the Supreme Court's repeated determination that the interest in public disclosure of information concerning those trying to influence the political process is sufficiently compelling to outweigh the burdens that disclosure may impose. *See McConnell*, 540 U.S. at 230-31; *Buckley*, 424 U.S. at 82; *Harriss*, 347 U.S. at 626; *see also Bellotti*, 435 U.S. at 792 n.32.

E

None of this is to say that repercussions from compelled disclosure can never outweigh the government's interest in requiring it of a particular organization. In 1958, the Supreme Court held that the State of Alabama could not require disclosure of the local membership list of the National Association for the Advancement of Colored People (NAACP), because the organization "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *NAACP*, 357 U.S. at 462. "Under these circumstances," the Court said, "we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it . . . ." *Id*. at 462-63. Upon the same showing, the Court struck down a municipal ordinance compelling disclosure of the membership of an Arkansas branch of the NAACP. *Bates v. City of Little Rock*, 361 U.S. 516, 523-24 (1960).[13]

---

[13]Similarly, in *Brown v. Socialist Workers '74 Campaign Committee*, the Court held that the compelled disclosure of contributions to and expenditures by the Socialist Workers Party was

In *Buckley*, the Court reached the opposite conclusion regarding the compelled disclosure of contributions to candidates and political parties. The Court first rejected a claim that such disclosure requirements were facially invalid, concluding that "certainly in most applications" they survived exacting scrutiny. 424 U.S. at 68. It then went on to consider whether the requirements were unconstitutional as applied to minor parties and independent candidates:

> There could well be a case, similar to those before the Court in *NAACP v. Alabama* and *Bates*, where the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the Act's requirements cannot be constitutionally applied. But no appellant in this case has tendered record evidence of the sort proffered in *NAACP v. Alabama*. Instead, appellants primarily rely on the clearly articulated fears of individuals, well experienced in the political process. At best they offer the testimony of several minor-party officials that one or two persons refused to make contributions because of the possibility of disclosure.

*Id.* at 71-72 (internal citation and footnotes omitted). "On this record," the Court said, "the substantial public interest in disclosure identified by the legislative history of this Act

---

unconstitutional in light of "substantial evidence" of harassment, including "proof of specific incidents" of "threatening phone calls and hate mail, the burning of [party] literature, the destruction of [party] members' property, police harassment of a party candidate, . . . the firing of shots at [a party] office," and the dismissal of 22 party members by their employers. 459 U.S. 87, 98-99 (1982).

outweighs the harm generally alleged," even as to minor parties and independent candidates. *Id*. at 72.[14]

To its credit, NAM does not suggest that its more than 11,000 corporate members -- constituting "the nation's largest industrial trade association," Appellant's Br. ii -- are as vulnerable to retaliation as were the individuals who joined the Alabama NAACP in the 1950s. It must at least show, however, that they are more at risk than the contributors to minor parties and independent candidates whose challenge the Court rejected in *Buckley*. NAM's sole evidence consists of a declaration from its General Counsel, which states as follows:

> NAM regularly lobbies on a variety of hot-button issues, including global warming and nuclear power, that may lead to adverse consequences for members identified as "actively participa[ting]" in such efforts. For example, mob violence has been directed at firms targeted by anti-globalization forces and the more extreme advocates [sic] of global warming. . . . Firms that are identified as actively lobbying on issues relating to on-going litigation, e.g., asbestos, risk becoming litigation targets. Taking policy positions that are unpopular with some groups may lead to boycotts, shareholder suits, demands for political contributions or support, and other forms of harassment.

Amundson Decl. ¶ 10 (internal citations omitted).

---

[14]*See Buckley*, 424 U.S. at 74 (stating that a minor party can qualify for exemption from general disclosure requirements by showing "a reasonable probability that the compelled disclosure of [the] party's contributors' names will subject them to threats, harassment, or reprisals").

As the district court found, however, the five newspaper articles and one lawsuit cited to support this declaration "in no way indicate that any member of the NAM (or the NAM itself) has suffered harm or retaliation as a result of the NAM's lobbying activities" or as a result of being linked to NAM. *Nat'l Ass'n of Mfrs.*, 549 F. Supp. 2d at 61. In fact, there is no mention of NAM at all in any of the materials cited in the declaration.[15] In addition, "[a]lthough the NAM's website . . . already discloses the membership of over 250 organizations in the NAM, the NAM proffers no evidence of any past incidents suggesting that public affiliation with the NAM leads to a substantial risk of 'threats, harassment, or reprisals from either Government officials or private parties.'" *Id.* at 61 (quoting *Buckley*, 424 U.S. at 74).

This, then, is a case like *Buckley*, not *NAACP*. As in *Buckley*, the plaintiff has tendered no "record evidence of the sort proffered in *NAACP v. Alabama*." 424 U.S. at 71. Instead, it primarily relies on "clearly articulated fears" and a few examples of harassment unconnected to lobbying disclosures by NAM or any other entity.[16] Moreover, the risks that NAM

---

[15]*See* Amundson Decl. ¶ 10 (citing *IBEW, Local 1547 v. Alaska Util. Constr. Inc.*, 976 P.2d 852, 859 (Alaska 1999); David Rising, *Clashes Break Out Ahead of Summit*, ASSOCIATED PRESS, June 3, 2007; Peter Geier, *'Sea Change' in Asbestos Torts is Here: New Strategies, New Defendants Seen*, NAT'L L.J., Oct. 31, 2005; Robert Pear, *Doctors in Antitrust Fight Boycott Merck Products*, N.Y. TIMES, May 23, 2000; Harry Stoffer, *Toyota Joins Detroit 3 in CAFE Fight*, AUTOMOTIVE NEWS, July 30, 2007; Jim Lobe, *ExxonMobil Takes Heat on Global Warming*, INTER PRESS SERVICE NEWS AGENCY, July 12, 2005, *available at* http://www.ipsnews.net/print.asp?idnews=29469).

[16]NAM contends that in *Davis*, the Supreme Court "applied 'exacting scrutiny' to hold a reporting provision facially invalid --

claims its members would suffer if their participation in controversial lobbying were revealed are no different from those suffered by any organization that employs or hires lobbyists itself, and little different from those suffered by any individual who contributes to a candidate or political party. If that kind of risk rendered amended § 1603(b)(3) unconstitutional, it would invalidate most compelled lobbying disclosures in contravention of *Harriss*, and most compelled campaign finance disclosures in contravention of *Buckley*. Accordingly, we reject both NAM's facial and as-applied First Amendment challenges.

## III

We next address NAM's contention that amended § 1603(b)(3) is unconstitutionally vague. "Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal . . . ." *Buckley*, 424 U.S. at 77; *see Hill v. Colorado*, 530 U.S. 703, 732 (2000). "Where First Amendment rights are involved, an even 'greater degree of specificity' is required." *Buckley*, 424 U.S. at 77 (quoting *Smith v. Goguen*, 415 U.S. 566, 573

---

even though there was no evidence that wealthy, self-funding candidates faced specific injury -- because 'compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment.'" Appellant's Reply Br. 10 (quoting *Davis*, 128 S. Ct. at 2774-75). But that is a misreading of *Davis*. The Court held the reporting provision at issue in that case facially invalid because its only purpose was to implement asymmetric contribution limits that unconstitutionally discriminated against self-funded candidates. *Davis*, 128 S. Ct. at 2775. Because in disclosure cases "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights," and because the only governmental interest proffered was the enforcement of unconstitutional requirements, there was no need for the plaintiffs to show specific injury. *Id.* at 2775.

(1974)). Nonetheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *United States v. Williams*, 128 S. Ct. 1830, 1845 (2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)) (internal quotation marks omitted). And "the belief that the mere fact that close cases can be envisioned renders a statute vague" is a "basic mistake." *Williams*, 128 S. Ct. at 1846; *see Harriss*, 347 U.S. at 618 ("[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague even though marginal cases could be put where doubts might arise."); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 579 (1973) (same).

Amended § 1603(b)(3) requires disclosure of any organization that contributes more than $5000 in a quarterly period to a registrant or its client "to fund the lobbying activities of the registrant," and that "actively participates in the planning, supervision, or control of such lobbying activities." 2 U.S.C. § 1603(b)(3). NAM objects to two statutory terms as unconstitutionally vague. The first is the phrase "actively participates," which replaced the phrase "in whole or in major part" in the original version of the LDA. The second is the phrase "lobbying activities," which has been defined since 1995 as: "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is *intended*, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others." *Id.* § 1602(7) (emphasis added). Specifically, NAM contends that the definition's use of the word "intended" renders it impermissibly vague.[17]

---

[17]The phrase "lobbying contact" is defined separately, 2 U.S.C. § 1602(8); *see supra* note 2, and is not challenged by NAM.

We conclude that, although the statute may not be a paragon of clarity, it is not so vague as to violate the Constitution, even applying the heightened standard applicable to regulation of speech. We discuss the term "actively participates" in Part A and the LDA's use of "intended" to define "lobbying activities" in Part B. In Part C, we note additional considerations that further mitigate any vagueness concerns.

A

NAM's contention that it is impermissibly vague to require the disclosure of organizations that "actively participate" in the planning, supervision, or control of its lobbying activities is met at the start with a significant precedential hurdle. In *United States Civil Service Commission v. National Association of Letter Carriers*, the Supreme Court rejected a vagueness challenge to the Hatch Act, which barred federal employees from "tak[ing] 'an active part'" in political management or political campaigns. 413 U.S. at 568 (quoting 5 U.S.C. § 7324(a)(2) (1973)). It is difficult to see why the term "actively participates" is cripplingly vague in a statute that merely mandates disclosure, while "taking an active part" was acceptable in a statute that directly limited speech.

NAM seeks to distinguish *Letter Carriers* on the ground that there, the Court rejected the vagueness challenge "only after first explicitly incorporating into the phrase 'active part' a set of standards that had been developed by the Civil Service Commission over a period of five decades, largely through the process of over 3,000 written adjudicatory opinions." Appellant's Br. 45-46. "It was only after linking the statutory prohibition back to the body of work produced by the Civil Service Commission," NAM contends, "that the Supreme Court found that the 'active part[icipation]' language avoided vagueness concerns." *Id.* at 46. Here, by contrast, there is no

record of "thousands of decisions and other interpretive statements defining the contours of 'active part[icipation]' . . . on which the NAM may rely." *Id.* at 47-48.

This argument has *Letter Carriers* exactly backwards. The thousands of Civil Service Commission decisions referred to were not the Hatch Act's saving grace; they were its potentially fatal flaw. An Act of Congress would "unquestionably be valid," the Court said, if "in plain and understandable language [it] forbade . . . actively participating in fund-raising activities for a partisan candidate or . . . actively managing the campaign of a partisan candidate for public office." *Letter Carriers*, 413 U.S. at 556. The problem with the Hatch Act was that it did not just bar federal employees from taking "an active part in political management or in political campaigns," but rather went on to define that statutory phrase as "mean[ing] those acts . . . which were prohibited . . . before July 19, 1940, by determinations of the Civil Service Commission." *Id.* at 550. Indeed, the lower court had found this definition impermissibly vague *because* that court construed it "as incorporating each of the several thousand adjudications of the Civil Service Commission . . . , many of which are said to be undiscoverable, inconsistent, or incapable of yielding any meaningful rules to govern present or future conduct." *Id.* at 571 (citing 346 F. Supp. 578, 582-83, 585 (D.D.C. 1972)).

The Supreme Court, however, took "quite a different view of the statute," which saved it from invalidation. 413 U.S. at 571. In the Court's view, Congress intended the statutory phrase to be defined not by the thousands of administrative decisions, but by "the rules that had evolved over the years from [those] repeated adjudications." *Id.* at 572. "Those rules," the Court said, "were restated by the Commission in 1970 in the form of regulations specifying the conduct that would be prohibited" by

the Hatch Act. *Id.* at 576. And there was "nothing impermissibly vague" in those regulations. *Id.* at 576-77.

Therein lies NAM's problem. The Hatch Act regulations to which the Supreme Court referred prohibited federal employees from, inter alia, "*actively participating* in a fund-raising activity of a partisan candidate" and "*[t]aking an active part* in managing the political campaign of a partisan candidate for public office." *Id.* at 576-78 n.21 (quoting 5 C.F.R. § 733.122(b)(4), (5) (1973)) (emphases added). The Court expressly rejected the claim that the above-italicized words rendered the regulations impermissibly vague:

> There might be quibbles about the meaning of taking an 'active part in managing' or about 'actively participating in . . . fund-raising' . . . ; but there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.

*Id.* at 577-79. If "actively participating" was not too vague a term for the Hatch Act regulations, "actively participates" cannot be too vague a term here.[18]

---

[18]*Letter Carriers* noted that the clarity of the Hatch Act and the regulations was further enhanced by their carving out of certain conduct as specifically permissible. *See, e.g.*, 413 U.S. at 579 (noting that the Act and regulations "privilege[] the employee to '[e]xpress his opinion as an individual privately and publicly on political subjects and candidates'"). The LDA contains similar carve-outs. *See* 2 U.S.C. § 1602(8)(B) (excepting, from the definition of "lobbying

In fact, the amended LDA's use of "actively participates" is -- if anything -- narrower and less problematic. Section 1603(b)(3) does not apply to every entity that actively participates in "lobbying activities" writ large, but only to those that actively participate in the "planning, supervision, or control" of lobbying activities. Moreover, NAM need only identify those entities that actively participate in planning, supervising, or controlling *NAM's own* lobbying. These limitations give the association "fair notice" of what the statute requires. *Williams*, 128 S. Ct. at 1845.

B

As noted, amended § 1603(b)(3) requires disclosure of any entity that "actively participates in the planning, supervision, or control of [the] *lobbying activities*" of a registrant. 2 U.S.C. § 1603(b)(3)(B) (emphasis added). The definition of "lobbying activities" is contained in § 1602(7), a section that was enacted as part of the LDA in 1995 and that HLOGA did not alter. Section 1602(7) provides:

> The term 'lobbying activities' means lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work *that is intended, at the time it is performed*, for use in contacts, and coordination with the lobbying activities of others.

---

contact," nineteen forms of communication, including any communication "(iii) made in a speech, article [or] publication . . . made available to the public . . . ; (vii) [made in] testimony given before a committee . . . of the Congress . . . ; [or] (xiv) filed in the course of a public proceeding").

*Id.* § 1602(7) (emphasis added). NAM contends "that intent is too vague a concept to employ where core First Amendment rights may be deterred," Appellant's Br. 42, and that the LDA's use of an intent standard to define the term "lobbying activities" renders § 1603(b)(3), which includes that term, unconstitutionally vague.[19]

1. At the outset, it is important to point out that § 1602(7)'s definition of the term "lobbying activities" -- including its use of an intent standard -- applies not only to the provision that NAM challenges here, § 1603(b)(3), but to every provision of the LDA that uses the term. Such provisions form the cornerstone of the statute. *See* 2 U.S.C. § 1603(b)(5) (requiring "[e]ach registration" under the Act to contain a statement of "the general issue areas in which the registrant expects to engage in lobbying activities on behalf of the client" and "specific issues that have . . . already been addressed or are likely to be addressed in lobbying activities"); *id.* § 1604(a) (requiring each registrant to file a report "on its lobbying activities during [each reporting] period"). Hence, if the term is too vague, it brings down much of the statutory edifice.

But this point is not important only to show how consequential a vagueness finding would be. Rather, because the same definition of lobbying activities has been in the statute since 1995, it also suggests the impressive number of registrants

---

[19]NAM also contends that the "intent standard here is further clouded because [amended § 1603(b)(3)] does not even make clear whose intent controls." Appellant's Br. 43. We do not find that question cloudy, and agree with both the district court and the United States Attorney that "the relevant intent is that of the affiliate who undertakes the 'preparation and planning activities, research [or] other background work' at issue." *Nat'l Ass'n of Mfrs.*, 549 F. Supp. 2d at 65.

who apparently have been able to overcome the ambiguity that NAM perceives. No one filed a vagueness (or any other) challenge to any part of the LDA during the twelve years before HLOGA amended it in 2007.

NAM discounts the importance of this fact on the ground that, under the pre-2007 version of § 1603(b)(3), it had no need to sue because "groups like the NAM did not have to concern themselves with assessing the underlying intent" of their members except for "those members that 'in whole or *in major part* plan[ned], supervise[d] or control[led]' such 'lobbying activities.'" Appellant's Br. 45 (quoting § 1603(b)(3) (1995)). But this argument misses the mark. The point is not that groups like NAM did not challenge the term "lobbying activities" as vague in the context of § 1603(b)(3), but that *no* registrant -- including NAM -- challenged the term's use in *any* provision of the statute. The fact that no registrant raised a challenge is hardly dispositive, but it does suggest that the multitude of lobbyists and organizations that had to comply with the statute for a dozen years did not find its definition of "lobbying activities" too difficult to understand.

2. Proceeding to NAM's contention that intent is legally too vague a concept to employ in a lobbying disclosure statute, we are once again met by the Supreme Court's first case on the subject, *Harriss*. As we discussed in Part II, *Harriss* upheld the nation's first lobbying statute, the FRLA, against a First Amendment challenge. But *Harriss* also addressed a vagueness challenge to the same statute, which (as construed by the Court) required reporting of "all contributions and expenditures *having the purpose of* attempting to influence legislation through direct communication with Congress." 347 U.S. at 623 (emphasis added). The Court concluded that the Act was not too vague to pass constitutional muster. *Id.* at 623-24.

Just two Terms ago, the Court confirmed that an intent standard *is not* per se vague, even in a statute regulating speech. The statute at issue in *United States v. Williams* criminalized the pandering of "material or purported material in a manner that reflects the belief, or that *is intended to* cause another to believe, that the material or purported material is, or contains" child pornography. 128 S. Ct. at 1836-37 (emphasis added) (quoting 18 U.S.C. § 2252A(a)(3)(B)). In rejecting a vagueness challenge, the Court stated:

> The statute requires that the defendant hold, and make a statement that reflects, the belief that the material is child pornography; or that he communicate in a manner intended to cause another so to believe. Those are clear questions of fact. Whether someone held a belief or had an intent is a true-or-false determination, not a subjective judgment such as whether conduct is "annoying" or "indecent." . . . To be sure, it may be difficult in some cases to determine whether these clear requirements have been met. *But courts and juries every day pass upon knowledge, belief and intent -- the state of men's minds -- having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.*

*Id.* at 1846 (emphasis added) (internal quotation marks and citation omitted).[20]

---

[20]NAM's argument that the notion of "organizational intent" is "particularly elusive," Appellant's Br. 43, is vulnerable to a similar response. Just as courts every day pass on the intent of individuals, so too have courts long applied scienter requirements to corporations. *See, e.g.*, *Arthur Andersen LLP v. United States*, 544 U.S. 696, 706 (2005); *N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S.

NAM seeks to distinguish *Williams* as a case involving pornography rather than protected speech, and thus as not posing the heightened vagueness concerns present in cases involving the First Amendment. But the *Williams* Court noted that the statute at issue there could reach some protected speech, 128 S. Ct. at 1844, and nothing in its discussion of the void-for-vagueness doctrine suggests its analysis is inapplicable to protected speech. To the contrary, the Court began its work by setting forth the vagueness analysis that applies "in the First Amendment context." *Id.* at 1845. Accordingly, absent special circumstances not present here, there is no reason to conclude that the "every day" task of assessing intent is inherently vague when protected speech is involved.[21]

---

481, 494-95 (1909).

[21]Notwithstanding the Court's approval of an intent standard in *Williams*, NAM maintains that two earlier cases -- *Buckley* and *FEC v. Wisconsin Right to Life (WRTL II)* -- establish "that intent is too vague a concept where core First Amendment rights may be deterred." Appellant's Br. 42 (citing *Buckley*, 424 U.S. at 43-44; *WRTL II*, 551 U.S. 449, 467-69 (2007)). That description overreads both cases. Neither *Buckley* nor *WRTL II* suggested that intent standards are generally impermissible in the First Amendment context. Rather, those cases rejected their use "to distinguish constitutionally protected political speech from speech that [Congress] may proscribe." *WRTL II*, 551 U.S. at 467. Intent plays no comparable role in the LDA. Indeed, *Buckley* itself approved the use of a purpose standard elsewhere in FECA. *See Buckley*, 424 U.S. at 23-24 & n.24. Certainly, *Buckley* and *WRTL II* provide no warrant for ignoring the Court's holdings in *Williams* and *Harriss* -- the latter of which accepted a purpose standard in the context of lobbying disclosure.

C

To the extent that any vagueness concerns still linger, they are mitigated by two additional characteristics of the amended LDA: (1) scienter requirements that must be satisfied before either criminal or civil penalties may be imposed, and (2) a safe harbor option that permits a registrant to pretermit consideration of the terms that NAM regards as vague.

1. A "scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see Gonzales v. Carhart*, 550 U.S. 124, 149 (2007); *Hill*, 530 U.S. at 732. Intent is itself a form of scienter that can perform that function. *See Village of Hoffman Estates*, 455 U.S. at 502. But under the LDA, criminal sanctions attach only if the government proves that a violation was committed "knowingly and corruptly," 2 U.S.C. § 1606(b) -- a much stronger form of scienter. In *Arthur Andersen LLP v. United States*, the Court held that "[o]nly persons conscious of wrongdoing" can be said to act "knowingly . . . [and] corruptly." 544 U.S. 696, 706 (2005) (ellipses in original). Hence, NAM need not hedge its associational activity for fear that good faith mistakes will result in criminal liability.[22]

---

[22]We also note that, as directed by the statute, the Secretary of the Senate and Clerk of the House have issued "guidance and assistance on the registration and reporting requirements." 2 U.S.C. § 1605(a)(1). Although that guidance does not have the force of law, the United States Attorney would be hard pressed to prove a "knowing" and "corrupt" violation by an organization that has adhered in good faith to such guidelines.

Unlike criminal sanctions, civil penalties may be imposed under the LDA even if a violation is not both "knowing" and "corrupt" -- a "knowing" failure to comply with the statute will do.[23]  Nonetheless, the Supreme Court has found a "knowing" requirement sufficient to ameliorate vagueness concerns.  *See Hill*, 530 U.S. at 732.  That term requires at least a knowledge of the relevant facts, *United States v. Barnes*, 295 F.3d 1354, 1367 (D.C. Cir. 2002), thereby mitigating NAM's concern that it may not be able to learn those facts.  In particular, intent is itself a "clear question[] of fact.  Whether someone . . . had an intent is a true-or-false determination."  *Williams*, 128 S. Ct. at 1846.  Hence, as the district court concluded, "if a registrant, in good faith, misinterprets the purpose of research or background work performed by one of its affiliates . . . , the registrant cannot be found to have knowingly (or 'knowingly and corruptly') failed to disclose that affiliate."  *Nat'l Ass'n of Mfrs.*, 549 F. Supp. 2d at 66.

2.  Finally, Congress balanced its adoption of a more stringent disclosure standard in amended § 1603(b)(3)(B) by adding a safe harbor provision as well.  That provision states:

> No disclosure is required under paragraph (3)(B) if the organization that would be identified as affiliated with the client is listed on the client's publicly accessible Internet website as being a member of or contributor to the client, unless the organization in whole or in major

---

[23]Section 1606(a) states that civil liability attaches to a knowing failure to "(1) remedy a defective filing within 60 days after notice of such a defect by the Secretary . . . or the Clerk . . . ; or (2) comply with any other provision of this chapter."  2 U.S.C. § 1606(a).  Where notice is given, of course, the 60-day grace period further diminishes vagueness concerns.

part plans, supervises, or controls such lobbying activities.

2 U.S.C. § 1603(b).  Hence, an active participant in NAM's lobbying can avoid being so identified if NAM simply lists it as a member on NAM's website -- as long as the member does not meet the higher participation standard ("in whole or in major part") that applied before passage of HLOGA.  In addition to permitting its members to avoid the risk of more direct association with controversial lobbying campaigns, this safe harbor allows NAM to avoid the risk of violating those statutory provisions that it regards as vague.

Of course, reliance on this safe harbor may lead to over-disclosure, and in some cases disclosing mere association with an organization may cause substantial harm.  *See NAACP*, 357 U.S. at 462.  But the retaliation concerns that NAM has specifically asserted are based not on its members' association with NAM *simpliciter*, but rather on their association with NAM's lobbying on particular issues.  NAM has proffered no evidence that merely being unmasked as one of its members is hazardous to an organization's health.[24]  Hence, the safe harbor provision provides yet a further opportunity to ameliorate any vagueness concerns that amended § 1603(b)(3) may engender.

For the foregoing reasons, we conclude that neither the term "actively participates" nor the term "lobbying activities" renders amended § 1603(b)(3)(B) impermissibly vague.

---

[24]*See* Amundson Decl. ¶ 10 (averring that harassment may be directed at firms identified as "actively participat[ing]" in NAM's lobbying on global warming, as "actively lobbying" on issues related to ongoing asbestos litigation, and as "[t]aking policy positions that are unpopular").

IV

For more than sixty years, Congress has sought to expose the lobbying of government officials to public scrutiny. Acronyms and intricacies aside, the progression from the FRLA to the LDA to the HLOGA marks the legislature's attempt to shine increasing light on the efforts of paid lobbyists to influence the public decisionmaking process. We find nothing unconstitutional in the way Congress has gone about that task. Accordingly, the decision of the district court, rejecting the appellant's challenge to the constitutionality of section 207 of the Honest Leadership and Open Government Act of 2007, is

*Affirmed.*