# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 5, 2014                    Decided June 27, 2014

No. 13-7063

TONIA EDWARDS AND BILL MAIN,
APPELLANTS

v.

DISTRICT OF COLUMBIA,
APPELLEE

---

Consolidated with 13-7064

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01557)

---

*Robert J. McNamara* argued the cause for appellants. With him on the briefs were *William H. Mellor III* and *Robert W. Gall*. *Paul M. Sherman* entered an appearance.

*Erik Jaffe* and *Ilya Shapiro* were on the brief for *amicus curiae* Cato Institute in support of appellants.

*Mary L. Wilson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With her on the brief were *Irvin*

*B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: HENDERSON, BROWN and WILKINS, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: This case is about speech and whether the government's regulations actually accomplish their intended purpose. Unsurprisingly, the government answers in the affirmative. But when, as occurred here, explaining *how* the regulations do so renders the government's counsel literally speechless, we are constrained to disagree.

In Washington, D.C., it is illegal to talk about points of interest or the history of the city while escorting or guiding a person who paid you to do so—that is, unless you pay the government $200 and pass a 100-question multiple-choice exam. The District requires that certain tour guides obtain a tour-guide license, which can be procured by paying application, license, and exam fees totaling $200, and passing the exam, of course. Operating as a paid, unlicensed tour guide is punishable by up to 90 days in jail or a fine of up to $300, or both. Believing the licensing scheme to be an unconstitutional, content-based restriction of their First Amendment rights, Appellants, Tonia Edwards and Bill Main, refused to comply and filed suit in district court. The court ultimately upheld the regulations, reasoning the scheme placed only incidental burdens on speech that were no greater than necessary to further the District's substantial interest in promoting the tourism industry. Finding the record wholly devoid of evidence supporting the burdens the challenged

regulations impose on Appellants' speech, we reverse and remand.

## I

Edwards and Main own and operate "Segs in the City," a Segway-rental [1] and tour business located in Washington, D.C., as well as in Annapolis and Baltimore, Maryland. As part of their business model, Appellants rent Segways to individuals for private use and provide tours to small groups of people that rent Segways. In D.C., Segs in the City provides a variety of tours along the city's streets and sidewalks. During the summer months, about half of the tours are led by either Edwards or Main; the rest are conducted by seasonal independent contractors that Appellants hire.

A Segs in the City tour has two phases. First, a tour leader trains a group of no more than ten people how to ride a Segway and how to comply with local traffic and safety regulations. Then, after mastering their newfangled transport, customers depart with their tour guide for one of several established tour routes. Each tour lasts between one and three hours, and Segs in the City operates up to five tours a day, seven days a week. Tour guides use radio earpieces to maintain constant communication with their customers. Through their earpieces, tour-group members are advised where the group is going next and entertained with stories about nearby points of interest.

---

[1] Segways are self-balancing, personal-transport vehicles.

4

A

Several laws govern various aspects of these activities.
First, Segs in the City is required to have a general business
license. *See* D.C. CODE § 47-2851.03d. Additionally, the
city has rules governing the use of Segways. *See* D.C. MUN.
REGS. tit. 18, § 1200 *et seq.* Appellants and their employees
comply with both. What Edwards and Main object to,
however, are District regulations that levy civil and criminal
penalties for conducting a tour without first taking and
passing a multiple-choice exam. D.C. law prohibits tour
guides from receiving compensation to "guide or escort any
person through or about the District of Columbia, or any part
thereof, unless he shall have first secured a license so to do."
D.C. CODE § 47-2836.

Implementing regulations clarify the District's
interpretation of what it means to be a "sightseeing guide."
A "sightseeing tour guide" is anyone who either (1) "engages
in the business of guiding or directing people to any place or
point of interest in the District" *or* (2) "who, in connection
with any sightseeing trip or tour, describes, explains, or
lectures concerning any place or point of interest in the
District to any person." D.C. MUN. REGS. tit. 19, § 1200.1.
The regulations specifically govern Segway tours. *See id.*
§ 1201.3 (prohibiting unlicensed entities from conducting "for
a fee" tours on "self-balancing personal transport vehicles").
Violators may be subject to both a $300 fine and 90 days in
prison. *See* D.C. MUN. REGS. tit. 19, § 1209.2; *see also* D.C.
CODE § 47-2846.

Altogether, five requirements must be satisfied to obtain
a tour-guide license. *See* D.C. MUN. REGS. tit. 19, § 1203.
The applicant must (1) be at least eighteen years old, *id.*
§ 1203.1(a); (2) be proficient in English, *id.* § 1203.1(b); (3)

not have been convicted of certain specified felonies, *id.* § 1203.1(c); (4) make a sworn statement that all statements contained in his or her application are true and pay all required licensing fees, *id.* § 1203.2; and (5) pass an examination "covering the applicant's knowledge of buildings and points of historical and general interest in the District," *id.* § 1203.3.

Appellants take particular exception to the fifth requirement—the examination. Consisting of 100 multiple-choice questions, applicants must master subject-matter from the following fourteen categories: Architecture; Dates; Government; Historical Events; Landmark Buildings; Locations; Monuments and Memorials; Museums and Art Galleries; Parks, Gardens, Zoos, and Aquariums; Presidents; Sculptures and Statues; Universities; Pictures; and Regulations. Applicants are further advised that questions are formed from data found in nine publications. There are multiple versions of the exam, and applicants must obtain a minimum score of 70 to pass.

B

Contending the regulations' restriction on their speech violates the First Amendment, Edwards and Main filed a motion for preliminary injunction in the district court. *See Edwards v. District of Columbia*, 765 F. Supp. 2d 3, 6 (D.D.C. 2011). The District opposed Appellants' motion for injunctive relief and sought to have the suit dismissed. *Id.* The district court denied the preliminary injunction, concluding Appellants were unlikely to prevail on the merits because the regulations are "unrelated to the content of expression and have, at most, an incidental effect on some speakers or messages but not others." *Id.* at 15–16. The district court denied without prejudice the District's motion to

dismiss, however, affording the parties an opportunity to conduct limited discovery. *Id.* at 20.

At the close of discovery, the parties filed cross-motions for summary judgment. Once again siding with the District, the trial judge determined the "licensing scheme targets the non-expressive conduct of guiding, directing and, more broadly, escorting, a commercial sightseeing trip or tour, and only incidentally burdens speech." *Edwards v. District of Columbia*, 943 F. Supp. 2d 109, 118 (D.D.C. 2013). Then, applying intermediate scrutiny, the trial judge held the regulations are narrowly tailored to further at least two "substantial and legitimate regulatory interests": (1) providing for "the general welfare of society by attempting to ensure that those with serious felonies on their records are not guiding or directing tourists and residents around the District"; and (2) "promoting the tourism industry by attempting to ensure that those who guide or direct people around the District have, at least, some minimal knowledge about what and where they are guiding or directing people to." *Id.* at 122.

Consequently, the district court granted the District's motion for summary judgment, and Appellants filed a timely notice of appeal.[2]

---

[2] In case No. 13-7063, Appellants also timely appealed the district court's denial of their motion for preliminary injunction. On April 25, 2013, we consolidated these two appeals. Because our opinion decides the underlying merits, we dismiss No. 13-7063 as moot.

II

We review de novo a district court's grant of summary judgment, viewing all evidence in the light most favorable to the non-moving party. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013). On appeal, Appellants present two principal arguments. First, the district court erred in holding that the tour-guide regulations are a restriction on conduct instead of a content-based restriction on speech. Second, even if content- neutral, there is an insufficient evidentiary basis to conclude the regulations further the District's interest in addressing actual problems. Acceding to the former claim will trigger strict scrutiny. We need not determine whether strict scrutiny applies, however, because assuming the regulations are content-neutral, we hold they fail even under the more lenient standard of intermediate scrutiny.[3]

---

[3] The District's brief suggests the tour-guide license, like licensing schemes for lawyers and psychiatrists, is merely an occupational license subject only to rational basis review. *See* Appellee's Br. at 16, 23–24 (citing cases applying rational basis review); *see also id.* at 36–38 (citing *Lowe v. SEC*, 472 U.S. 181, 232, 235 (1985) (White, J., concurring), for the proposition that tour guides maintain a "relationship of trust and reliance" with their customers thus warranting professional licensure). The District is wrong. "One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession." *Lowe*, 472 U.S. at 232. Appellants do no such thing. They provide virtually identical information to each customer. *Cf. Moore-King v. Cnty. of Chesterfield, Va.*, 708 F.3d 560, 564, 569 (4th Cir. 2013) (upholding a fortune-teller licensing scheme under rational basis review because the appellant advised clients on "specific inquiries about their businesses, relationships, or other personal matters").

As a preliminary matter, we note Edwards and Main lodged both a facial and as-applied challenge to the regulations. To succeed in a typical facial attack, Appellants must establish "that no set of circumstances exists under which [the challenged regulations[4]] would be valid or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010). In the First Amendment context, the Supreme Court recognizes "a second type of facial challenge," under which a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008). In neither case, however, must Appellants show injury to themselves. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) ("Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court."); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

Conversely, to prevail on an as-applied First Amendment challenge, Appellants must show that the regulations are unconstitutional as applied to their particular speech activity.

In any event, given the regulations' incoherence, we doubt the District could survive even rational basis review.

[4] As noted in their briefs and confirmed during oral argument, Appellants challenge only the regulations defining a tour guide (D.C. MUN. REGS. tit. 19 § 1200.1), the exam requirement and related fees (D.C. MUN. REGS. tit. 19, § 1203.3), and the tour-bus driver exemption (D.C. MUN. REGS. tit. 19, § 1204.3). *See* Appellants' Br. at 7–8, 9, 22–23; Oral Arg. at 11:28–12:30.

*See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 802–03 (1984). "[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). The substantive rule of law is the same for both challenges. *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010). We conclude the challenged regulations are both incongruent as to any tour guide and overbroad.

## A

In examining the constitutionality of the challenged regulations, we will assume, arguendo, the validity of the District's argument that the regulations are content-neutral and place only incidental burdens on speech. The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. Content-neutral regulations on speech are subject to intermediate scrutiny. Under this standard, a government regulation is constitutional if (1) "it is within the constitutional power of the Government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest," *United States v. O'Brien*, 391 U.S. 367, 377 (1968); and (5) the regulation leaves open ample alternative channels for communication, *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The failure to satisfy any prong of the test invalidates the regulation. *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990).

10

1

All parties agree promulgating the licensing regulations is within the District's constitutional power. *See* Appellants' Br. at 13 (noting the suit "is not a challenge to the District of Columbia's ability to regulate businesses generally or require them to obtain licenses"). Thus, the first *O'Brien* prong is satisfied. Nor could a serious argument be made otherwise, for Congress long ago delegated to the District the police power to regulate businesses and occupations. *See, e.g.*, *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 113 & n.9 (1953); *see also Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings . . . ."). Additionally, because we assume the District's licensing scheme is, on balance, content-neutral, the third prong of the *O'Brien* test also is satisfied. *See Am. Library Ass'n v. Reno*, 33 F.3d 78, 84 (D.C. Cir. 1994). Accordingly, the second, fourth, and fifth prongs remain.

2

As to prongs two and four, Appellants present two arguments. First, they contend the record is "utterly devoid" of evidence that the burdens of studying for and passing the 100-question exam "do anything at all to advance a legitimate government objective." Appellants' Br. at 43. Second, they argue there is no evidence in the record the District's interests would be achieved less effectively absent the exam requirement. We agree.

Collectively, prongs two and four of the *O'Brien* test query whether the challenged regulations are narrowly tailored to further a substantial government interest. *See*

*O'Brien*, 391 U.S. at 381–82. A regulation is "narrowly tailored" when it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

As a threshold matter, Appellants do not appear to dispute the District's substantial interest in promoting the tourism industry and economy. The District attracts approximately fifteen million visitors each year and supports more than 66,000 tourism-related, full-time jobs, which generate some $2.6 billion in wages. *See Edwards*, 765 F. Supp. 2d at 18. Undoubtedly, promoting a major industry that contributes to the economic vitality of the District is a substantial government interest. *See Smith v. City of Ft. Lauderdale, Fla.*, 177 F.3d 954, 955–56 (11th Cir. 1999) (recognizing Florida's substantial interest in promoting tourism—"one of Florida's most important economic industries"); *Ctr. for Bio-Ethical Reform, Inc. v. City & Cnty. of Honolulu*, 455 F.3d 910, 922 (9th Cir. 2006) (acknowledging Hawaii's substantial interest in protecting and promoting the tourism industry).

That the District's asserted interests are substantial in the abstract, however, does not end our inquiry. To satisfy narrow tailoring, the District must prove the challenged regulations directly advance its asserted interests. *See United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012) ("There must be a direct causal link between the restriction imposed and the injury to be prevented."). "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on . . . speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993); *see also*

*Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002) (noting that courts "closely scrutinize challenged speech restrictions to determine if they indeed promote the Government's purposes in more than a speculative way").

To be sure, the District is not required to produce empirical data "accompanied by a surfeit of background information." *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Instead, the Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." *Id.* That said, the burden remains on the District to establish the challenged regulations' efficacy, and a regulation cannot be sustained "if there is little chance that the restriction will advance the State's goal." *Id.* at 566.

The District rehearses a plethora of harms it claims to forestall with the exam requirement: (1) unscrupulous businesses, *Edwards*, 943 F. Supp. 2d at 122; (2) tourists whose welfare is jeopardized by tour guides lacking a minimal level of competence and knowledge, *id.*; (3) tour guides lacking "minimal knowledge about what and where they are guiding or directing people to," *id.*; (4) consumers unprotected from unknowledgeable, untrustworthy, unqualified tour guides, *id.* at 123; (5) tour guides lacking "at least a minimal grasp of the history and geography of Washington, D.C.," *id.*; (6) visitors vulnerable to "unethical, or uninformed guides," *id.*; (7) tourists treated unfairly or unsafely, *see* Appellee's Br. at 24; (8) tourists who are "swindled or harassed by charlatans," *see id.*; (9) degradation of the "quality of the consumer's experience," *see id.* at 36; (10) "tour guides . . . too unserious to be willing to study for a single exam," *see id.*; and (11) tour guides "abandon[ing

tourists] in some far-flung spot, or charg[ing] them additional amounts to take them back," *see id.* at 38.  Together, these harms all fall under the banner of the District's interest in "maintaining, protecting, and promoting [its] tourism industry and economy."  *See* Appellee's Br. at 19.

Despite the District's seemingly talismanic reliance on these asserted problems, the record contains no evidence ill-informed guides are indeed a problem for the District's tourism industry.  The only record "evidence" supporting the District's beliefs regarding the perils of unlicensed tour guides is the District's 30(b)(6) deposition testimony that guides with criminal convictions *might* pose a danger, though no evidence exists they actually have.  *See* J.A. 154.  This will not do.  *See Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 196 ("[I]n the realm of First Amendment questions[,] . . . the [legislature] must base its conclusions upon substantial evidence.").  The District's reliance on a Washington Post article dating from 1927 to justify the exam requirement is equally underwhelming.  *See* Appellee's Br. at 4, 19, 46.  The article merely establishes that, nearly a century ago, the newspaper expressed concern about unscrupulous or fraudulent charitable solicitation and that an unidentified number of persons said self-styled tour guides were overly aggressive in soliciting business.  Reliance on decades-old evidence says nothing of the present state of affairs.  Current burdens demand contemporary evidence. *See Shelby Cnty. Ala. v. Holder*, 133 S. Ct. 2612, 2627 (2013) ("[A] statute's current burdens must be justified by current needs."); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 802 (1988) (rejecting the government's reliance on antiquated evidence to justify current burdens);  *Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 415 (1935) ("A statute valid when enacted may become invalid by change in the conditions to which it is applied.").

Nor are the District's suppositions validated by studies, anecdotal evidence, history, consensus, or common sense. The District says "many other cities . . . have concluded that licensing tour guides is warranted to promote the tourism industry and protect consumers." Appellee's Br. at 46. By "many," the District means exactly five.[5] Yet, whatever the value of this evidence, it is diminished to the vanishing point by the scores of other U.S. cities that have determined licensing tour guides is *not* necessary to maintain, protect, or promote the tourism industry. Said differently, five cities do not a consensus make. *See Edenfield*, 507 U.S. at 771 (dismissing as insufficient anecdotal evidence the fact that Florida was one of four states with similar regulatory schemes); *cf.* Appellee's Br. at 46 ("[L]aws, legislative policy statements, and case law from other cities with heavy tourist trades reflect that history, consensus, and common sense justify protecting the District's tourists from unscrupulous, unlicensed guides."). Of course, the District need not demonstrate consensus before relying on evidence from other locales. *See, e.g.*, *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 50–51 (1995) (permitting reliance on the well-documented, detailed experience and studies of a single locale). However, an indiscriminate survey of the laws of

---

[5]   Although the District's brief identified five cities with tour-guide licensing requirements—Charleston, SC; New Orleans, LA; New York, NY; Savannah, GA; and Philadelphia, PA, *see* Appellee's Br. at 8–10, 24, 27—Philadelphia appears to have abandoned (at least for the time being) any intention of enforcing its law. *See Tait v. City of Philadelphia*, 639 F. Supp. 2d 582, 587–88 (E.D. Pa. 2009) (noting that the city testified it was "not ready to oversee the application and certification process [for tour guides] . . . primarily due to a lack of resources"). The actual fifth city, Williamsburg, Virginia, came to the court's attention as a result of Appellants' candor and due diligence. *See* Appellants' Reply Br. at 31 n.6.

other jurisdictions without marshaling any evidence about *why* those laws were enacted and *how* the regulations are enforced is not sufficient. *See Edenfield*, 507 U.S. at 771 (demanding evidence even when relying on similar legislation enacted in other locales).

The District can find no refuge in *National Association of Manufacturers v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009). There we upheld the Lobbying Disclosure Act of 1995, which was enacted because of concerns lobbyists were skirting the disclosure requirements of the 1946 Federal Regulation of Lobbying Act. 582 F.3d at 6. The government championed the law as a public information measure. *Id.* at 12. Plaintiffs argued such an "informational interest" must be validated by "studies, statistics, or empirical evidence explaining why [they] should be required to file disclosure statements." *Id.* at 15. We disagreed, but did so with the benefit of a far greater corpus of evidence than the District presents here.

First, the government's "vital national interest" in public disclosure was buttressed by more than fifty years of Supreme Court precedent. *See id* at 6 (citing *United States v. Harriss*, 347 U.S. 612, 625–26 (1954)); *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 97–100 (1961); *Meese v. Keene*, 481 U.S. 465, 485 n.19 (1987); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 354 n.18 (1995); *see also Citizens United v. FEC*, 588 U.S. 310, 369 (2010). The District points to no such precedent. Second, unlike here, the statute was bolstered by a legislative record and contemporary newspaper accounts that precisely explained the existing ills at which the law was aimed. *See Taylor*, 582 F.3d at 15 & n.9. Here, the District offers only speculation and senescent stories. Lastly, the statute was premised on the notion that "good government requires greater transparency"—a "value

judgment" that was not "susceptible to empirical evidence." *Id.* at 16. Here, the District's core premise is that tour guides who have not passed a multiple-choice exam will harm the tourism economy. *See* Appellee's Br. at 19. But this is exactly the sort of "economic" harm we distinguished in *Taylor* as being "susceptible to empirical evidence." *See Taylor*, 582 F.3d at 16.

Indeed, the Supreme Court has demanded evidence for the existence of harms in other contexts, too. *See, e.g.*, *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 169 (2002) (holding an ordinance regulating door-to-door solicitation unconstitutional in part because there was no "evidence of a special crime problem related to door-to-door solicitation in the record"); *Edenfield*, 507 U.S. at 771 (holding as unconstitutional a statute banning accountants' in-person solicitation because there was no evidence solicitation created the "dangers of fraud, overreaching, or compromised independence that the [government] claim[ed] to fear"); *Riley*, 487 U.S. at 790 (rejecting the State's interest in regulating the fairness of fees a professional fundraiser may charge charities because there was no evidence the existing fees were "anything less than equitable").

Even if we indulged the District's apparently active imagination, the record is equally wanting of evidence the exam regulation actually furthers the District's interest in preventing the stated harms. Curiously, the District trumpets as a redeeming quality the fact that, once licensed, "[t]our guides may say whatever they wish about any site, or anything else for that matter." Appellee's Br. at 27 (citing *Kagan v. City of New Orleans*, 957 F. Supp. 2d 774, 779 (E.D. La. 2013)). But we are left nonplussed. Exactly how does a tour guide with carte blanche to—Heaven

forfend—call the White House the Washington Monument further the District's interest in ensuring a quality consumer experience?[6] Also puzzling is the applicability of the exam requirement to specialty tour guides, such as those focused on ghost, food or movie tours.[7] A general exam requirement is ill-suited to ensuring such specialty guides are well informed. And the existence and persistence of such varied themes highlights how tourism is as much about entertaining as educating.

---

[6] We do not mean to suggest the District could somehow police the accuracy of a tour guide's speech by, for example, requiring that tour guides adhere to a script. Even if such speech advanced the District's interest in ensuring a quality consumer experience, its compulsion would doubtless be unconstitutional. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("Some of [the] Court's leading first Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say."); *see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 11 (1986) ("[A]ll speech inherently involves choices of what to say and what to leave unsaid."). That a lawyer's speech *is* policed for accuracy via malpractice suits and discipline threats does not compel a contrary conclusion. Such a distinction serves only to underscore the vast differences in kind between a professional's speech and that of a tour guide's. *See* Part II n.3, *supra*.

[7] *See, e.g.*, *Ghosts of LaFayette Park*, WASHINGTON DC GHOST TOURS, http://www.dcghosttours.com/ (last visited June 13, 2014); *Experience Culinary DC*, DC METRO FOOD TOURS, http://dcmetrofoodtours.com/ (last visited June 13, 2014); *TV and Movies Sites Tour of Washington DC*, TRUSTED TOURS & ATTRACTIONS, http://www.trustedtours.com/store/tv-and-movie-sit es-tour-of-washington-dc.aspx (last visited June 13, 2014); *see also* J.A. 169, 174.

The District also claims the exam requirement furthers its interests by "'weeding out tour guides too . . . unserious to be willing to study for a single exam.'" Appellee's Br. at 36 (quoting *Kagan*, 957 F. Supp. 2d at 780). Presumably, the effort required to study for and pass the exam, along with its $200 cost, are dispositive factors in winnowing the gamesome from the genuine. We are not persuaded. Perhaps most fundamentally, what evidence suggests market forces are an inadequate defense to seedy, slothful tour guides? To state the obvious, Segs in the City, like any other company, already has strong incentives to provide a quality consumer experience—namely, the desire to stay in business and maximize a return on its capital investment. Lest there be any doubt, the sums involved are not insignificant. For starters, Segs in the City is required to obtain a general business license. *See* D.C. CODE § 47-2851.03d. To obtain a license, Segs in the City must remit $324.50 biennially, which consists of the following: (1) $200 license fee; (2) $70 application/renewal fee; (3) $25 endorsement fee; and (4) $29.50 technology fee. *See* D.C. MUN. REGS. tit. 17, § 500. Appellants have operated Segs in the City since 2004.[8] What's more, the least expensive Segway model, the i2, costs approximately $6,500.[9] Appellants maintain a fleet of at least eleven Segways. *See* J.A. 170. And the foregoing expenditures are to say nothing of the other business-related

---

[8] *See* SEGS IN THE CITY, http://www.segsinthecity.com/segsafaris.html (last visited May 22, 2014) ("Segs in the City has been conducting trainings and Segway Safaris since 2004 and is the most experienced and safest operator in the area.").

[9] *See, e.g.*, SEGWAY OF ANNAPOLIS, http://www.segwayofannapolis.com/store/index.php?l=product_detail&p=70 (last visited May 22, 2014).

expenses, like insurance and maintenance, Appellants must shoulder. These outlays are not unique to Segs in the City; they presumably are equally expensive—if not more so—for tour operators that rely on pedicab, bus, trolley, or boat.

Further incentivizing a quality consumer experience are the numerous consumer review websites, like Yelp and TripAdvisor, which provide consumers a forum to rate the quality of their experiences. One need only peruse such websites to sample the expressed outrage and contempt that would likely befall a less than scrupulous tour guide. Put simply, bad reviews are bad for business. Plainly, then, a tour operator's self-interest diminishes—in a much more direct way than does the exam requirement—the harms the District merely hypothesizes. *See City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994) (observing that "[r]esidents' self-interest [in maintaining their own property values] diminishe[d] the danger of the unlimited proliferation of residential signs" the city feared). That the coal of self-interest often yields a gem-like consumer experience should come as no surprise. In his seminal work, *The Wealth of Nations*, celebrated economist and philosopher Adam Smith captured the essence of this timeless principle: "It is not from the benevolence of the butcher, the brewer or the baker that we expect our dinner, but from their regard to their own interest." ADAM SMITH, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS 12 (Digireads.com Publishing 2004) (1776).

There is little mystery, therefore, that tour guides possess every incentive to provide quality tours.[10] With this concept

---

[10] Naturally, market forces are but one factor among a group of relevant considerations when determining the constitutionality of a government's regulation. Said differently, the presence of market

in mind, what, pray tell, does passing the exam have to do with regulating unscrupulous tour businesses and unethical guides? How does memorization of addresses and other, pettifogging data about the District's points of interest protect tourists from being swindled or harassed by charlatans? Why would a licensed tour guide be any less likely to treat tourists unfairly and unsafely by abandoning them in some far-flung spot or charging additional amounts for return passage?—surely, success on the District's history exam cannot be thought to impart both knowledge *and* virtue. The District never bothers to engage with these and other basic inquiries. The questions it does answer, however, serve only to underscore the substantial mismatch between its stated objectives and the means chosen to achieve those goals.

During oral argument, the District made several telling admissions, revealing the scheme's lack of coherence and impermissibly underinclusive scope. Two circumstances render a regulation fatally underinclusive. The first is when "an exemption from an otherwise permissible regulation of speech may represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people." *Gilleo*, 512 U.S. at 51. The other is triggered where, as here, there is an arbitrary exemption from

forces does not require the District to surrender the tour guide industry to the free market, though, as a practical matter, nearly every city in America has so surrendered without any ill effect. *See* Part II.A.2 n.3, *supra*. The District remains free to impose any number of regulations on the industry including, for example, limiting the size of a tour group, prohibiting use of amplified sounds after a certain hour, restricting tours to certain parts of town, requiring that tours cease after a certain hour, and outlawing tour-guide solicitation in city streets. An exam requirement does not materially add to what are already robust consumer protection measures.

or "underinclusiveness of the scheme chosen by the government [that] may well suggest . . . the asserted interests either are not pressing or are not the real objects animating the restriction on speech." *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 493 (1997).

Here, the District conceded Appellants could, without a license, lecture at a single point of interest, i.e., stand in front of the White House and charge tourists a fee to audit the narration. *See* Oral Arg. at 15:36–16:09. But under such an arrangement, what would stop unlicensed tour guides from stationing themselves at various points of interest throughout the city and lecturing for a fee? If the stated harms are genuine, would not such a provision undermine the District's interest in promoting the tourism industry? Second, and equally perplexing, the District acknowledged that, pursuant to an exemption in the regulations, a tour-bus driver could, without a license, escort and direct tourists to points of interest, provided the driver refrained from speaking and relied exclusively on *any* audio recording for narration. *See id.* at 18:10–18:26. However, no credible attempt was made to explain how the potentially perverse outcomes would further the District's stated interests. When asked, for example, whether the regulations would permit a tour bus to recruit a drunk off the street to prerecord the audio narration, the District unequivocally answered, "yes." *Id.* at 23:22–23:58.

Similarly baffling was the District's wavering agreement the regulations would permit Appellants to give unlicensed tours if they also used an audio recording, since clause one[11]

---

[11] Clause one states unlicensed persons may not "engage[] in the business of guiding or directing people to any place or point of interest in the District." *See* D.C. MUN. REGS. tit. 19, § 1200.1.

of section 1200.1 does not regulate speech. *See id.* at 24:43–25:21. Myriad inconsistencies abound in that concession, however. Perhaps most notably, the District had, just minutes earlier, claimed Appellants could *not*, unless licensed, guide and direct tourists to points of interest and, instead of speaking, distribute pamphlets describing the various sites. *See id.* at 16:10–16:43. When pressed on the obvious incoherence of its admission, the District recanted, concluding that, although analogous to a tour bus, clause two[12] of section 1200.1 prohibited Appellants from using an audio recording. *See id.* at 27:56–28:25. In no event, however, did the District offer a rational explanation for the tour-bus exemption.[13] The District's failure to provide *any* justification—let alone a persuasive one—for the glaring inconsistency, effectively eviscerated what was left of the

---

[12]   Clause two provides that unlicensed persons may not, "in connection with any sightseeing trip or tour, describe[], explain[], or lecture[] concerning any place or point of interest in the District to any person." *See* D.C. MUN. REGS. tit. 19, § 1200.1 In its brief, the District argued Appellants lacked standing to challenge clause two of section 1200.1 because they "would be covered by the first clause since they are engaged in the business of guiding or directing people in the District regardless of any describing, explaining, or lecturing." Appellee's Br. at 18. Given the District's admission that clause two *is* controlling, however, it is unclear whether they continue to dispute Appellants' standing.

[13]   Indeed, we doubt any rational basis for the exemption exists. Of the five jurisdictions requiring a tour-guide license, the District alone has the dubious distinction of exempting tour buses that rely on audio recordings. *See* Charleston, SC (Charleston Code § 29-58; § 29-2); New Orleans, LA (New Orleans Code § 30-1486); New York, NY (N.Y. Admin. § 20-247); Savannah, GA (Savannah Code § 6-1508); and Williamsburg, VA (Williamsburg Code § 9-331).

regulations' waning credibility. *See id.* at 28:28–29:03. Why the regulations would permit a drunk's pre-recorded narration on a tour bus, but proscribe the same conduct on a Segway, remains an enigma. What the foregoing makes plain, however, is that the tour-bus exemption is arbitrary and renders the regulations impermissibly underinclusive.

Underinclusiveness is not the only way in which the regulations fail to pass constitutional muster. If, as we assume, the regulations are understood primarily as a restriction on conduct with only an incidental effect on speech, they also are overbroad. This is because clause two of section 1200.1 would forbid an unlicensed person from lecturing to a tour group, even if that group is being escorted by a fully licensed guide. *See* J.A. 156 ("[I]f there's a tour that is both led by licensed sightseeing guide and features commentary during the tour from an unlicensed individual who's describing, explaining or lecturing about the sights in Washington, D.C., that tour is operating in violation of the law.").

Also fatal to the District's regulatory scheme is the existence of less restrictive means to accomplish its interests. Of course, the means chosen "need not be the least restrictive or least intrusive." *See Ward*, 491 U.S. at 798. "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799. "We must therefore ask whether it is possible substantially to achieve the Government's objective in less burdensome ways" than the exam requirement. *See Alvarez*, 132 S. Ct. at 2555 (Breyer, J., concurring). We conclude the answer to this question is "yes."

In contrast with the harms the District says its regulations prevent, proposing less restrictive means to achieve its objectives requires no creativity. For example, nowhere in the record is there any evidence unscrupulous businesses, which engage in unfair or unsafe practices, could not be *more* effectively controlled by regulations that punish fraud or restrict the manner in which tour guides may solicit business. Likewise, no reason is offered why the threat of directionally challenged tour guides would not be better resolved by regulations requiring that tour guides carry a map or other navigational aid. Additionally, nowhere in the record is there anything to suggest a voluntary certification program—under which guides who take and pass the District's preferred exam can advertise as "city-certified guides"—would diminish the quality of the consumer's experience. In sum, the District has provided no convincing explanation as to why a more finely tailored regulatory scheme would not work.

****

The District failed to present any evidence the problems it sought to thwart actually exist. Even assuming those harms are real, there is no evidence the exam requirement is an appropriately tailored antidote. Moreover, the District provided no explanation for abjuring the less restrictive but more effective means of accomplishing its objectives. Because this lack of narrow tailoring is hardly unique to Appellants, we sustain both their facial and as-applied challenges to the offending regulations.[14] The district court's

---

[14] Having found the District's regulations unconstitutional due to lack of narrow tailoring, we need not consider whether the regulations permit ample alternative channels of communication. *See Turner*, 893 F.2d at 1392.

grant of summary judgment in favor of the District is, therefore, reversed, and we remand the case with instructions to grant Appellants' motion for summary judgment.[15]

*So ordered.*

---

[15] We are of course aware of the Fifth Circuit's contrary conclusion in *Kagan v. New Orleans*, No. 13-30801, 2014 WL 2460495 (5th Cir. June 2, 2014), which affirmed the constitutionality of a similar tour guide licensing scheme. We decline to follow that decision, however, because the opinion either did not discuss, or gave cursory treatment to, significant legal issues. *See Burka v. U.S. Dep't of Health & Human Servs.*, 142 F.3d 1286, 1290 (D.C. Cir. 1998) (finding as unpersuasive and declining to follow a Fifth Circuit opinion that neglected to discuss or mention binding, Supreme Court precedent); *Potomac Elec. Power Co. v. Dir., Office of Workers' Comp. Programs*, 606 F.2d 1324, 1329 (D.C. Cir. 1979) (declining to follow Fifth Circuit because "it did not discuss [an] issue in its brief opinion affirming [the district court]").